# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| ROBERT T. COOK, | ) | CASE NO. 4:14 CV 1283 |
| | ) | |
| PLAINTIFF, | ) | JUDGE SARA LIOI |
| | ) | |
| | ) | |
| vs. | ) | |
| | ) | MEMORANDUM OPINIOIN |
| | ) | |
| WILLIAM KATA, | ) | |
| | ) | |
| DEFENDANT. | ) | |

The matter is before the Court on the motion of defendant William Kata ("defendant" or "Kata") for summary judgment. (Doc. No. 36 ["Mot."].) Plaintiff Robert Cook ("plaintiff" or "Cook") has opposed defendant's motion (Doc. No. 43 ["Opp'n"]), and defendant has replied (Doc. No. 45 ["Reply"]). Defendant's motion is ripe for decision, and for the reasons that follow, the motion is granted.

## I. BACKGROUND

This case arises from events occurring on June 13, 2013. Plaintiff's residence is located on Hoss Avenue in Hubbard, Ohio. On that day, defendant William Kata, who is a deputy with the Trumbull County Sheriff's Department, went to plaintiff's residence to obtain the vehicle identification numbers ("VINs") from four "junk" vehicles on plaintiff's property.

Cook was previously noticed and issued summons for violation of Ohio Rev. Code § 4513.65 with respect to "junk" vehicles on his property. Kata was asked by

Deputy Wix, also with the Trumbull County Sheriff's Department, to retrieve the VINs from four of the vehicles pursuant to an agreement between Cook and the prosecutor reached at a pretrial conference conducted in connection with the summons. (Doc. No. 38 (Deposition of William Kata ["Kata Dep."]) at 295.[1]) Cook denies reaching an agreement with the prosecutor that the sheriff would come to his property to obtain the VINs from four "junk" vehicles. (Doc. No. 39 (Deposition of Robert Cook ["Cook Dep."] at 346).).

When Kata arrived at Cook's property, he began obtaining the VINs from the vehicles. Kata did not have a warrant or any other documentation. Cook came out of his house and confronted Kata regarding the reason for his presence and objected to Kata's presence without a warrant. Cook's testimony is mixed as to whether he told Kata to get out of the car in which Kata was looking for the VIN, or to leave the property. (Cook Dep. at 344-46.) Cook told Kata that he was calling the Ohio State Highway Patrol to send a cruiser because Cook had an armed intruder—Kata—on his property, and Kata observed Cook using his cell phone.

The parties have conflicting accounts of what took place next. According to Kata, Cook stated that he had a gun in his storage shed and was going to shoot Kata, and began walking toward the shed. Kata states that when he ordered Cook to stop walking toward the shed Cook turned toward Kata and threw coffee on him, then resumed walking toward the shed. At that point, Kata deployed his taser and struck Cook in the back. (Kata Dep. at 296-97.).

---

[1] All references to page numbers are to the page identification numbers generated by the Court's electronic case filing system.

2

Cook flatly denies that he told Kata he had a gun in his shed or was going to shoot Kata if he did not leave the property. (Cook Dep. at 349-50.) According to Cook, he walked away from Kata to meet the highway patrol when they arrived. Plaintiff claims that when he turned his back on Kata, Kata deployed his taser and struck Cook in the back, causing Cook to fall to the ground and drop his coffee and his cell phone. (Cook Dep. at 352-53.).

What is not in dispute with respect to the events of June 13, 2013, is that Cook was charged with aggravated menacing of Kata pursuant to Ohio Rev. Code § 2903.21(A). After a jury trial at which Cook was represented by counsel and testified on his own behalf, Cook was found guilty by the jury of aggravated menacing. (Doc. No. 36-2 (Judgment Entry and Jury Verdict); Cook Dep. at 342; Doc. No. 40 (Trial Transcript ["Tr."] at 595).).

## II. DISCUSSION

### A. Summary Judgment Standard

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if its resolution affects the outcome of the lawsuit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* If a reasonable jury could return a verdict for the nonmoving party, then summary judgment is not appropriate. *Id.*

The moving party must provide evidence to the court which demonstrates the absence of a genuine dispute as to any material fact. Once the moving party meets this initial burden, the opposing party must come forward with specific evidence showing that there is a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986); *Anderson*, 477 U.S. at 250. The nonmoving party may oppose a summary judgment motion "by any of the kinds of evidentiary material listed in Rule 56(c), except the mere pleadings themselves[.]" *Celotex*, 477 U.S. at 324. The Court must view all facts and evidence, and inferences that may be reasonably drawn therefrom, in favor of the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S. Ct. 993, 8 L. Ed. 2d 176 (1962).

General averments or conclusory allegations of an affidavit do not create specific fact disputes for summary judgment purposes. *See Lujan v. Nat'l Wildlife Fed.*, 497 U.S. 871, 888-89, 110 S. Ct. 3177, 111 L. Ed. 2d 695 (1990). "Summary judgment requires that a plaintiff present more than a scintilla of evidence to demonstrate each element of a prima facie case." *Garza v. Norfolk S. Ry. Co*. 536 F. App'x 517, 519 (6th Cir. 2013) (citing *Van Gorder v. Grand Trunk W. R.R.*, 509 F.3d 265, 268 (6th Cir. 2007)). "'The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party].'" *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989) (quoting *Anderson*, 477 U.S. at 252).

4

In summary, the district court's review on summary judgment is a threshold inquiry of determining whether there is the need for a trial due to genuine factual issues that must be resolved by a finder of fact because those issues may reasonably be resolved in favor of either party. *Anderson*, 477 U.S. at 250. Put another way, this Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52; *see also Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 578 (6th Cir. 2003).

**B. 42 U.S.C. § 1983**

Plaintiff alleges that Kata violated the Fourth and Fourteenth Amendments to the United States Constitution when Kata allegedly entered onto Cook's property to obtain VINs without the lawful right to do so and used excessive force against Cook. Cook seeks relief pursuant to 42 U.S.C. § 1983. In order to recover under § 1983, plaintiff must establish that Kata acted under color of state law and violated Cook's rights secured by the Constitution or laws of the United States. *See Adickes v. S.H. Kress & Co*. 398 U.S. 144, 150, 90 S. Ct. 1598 26 L. Ed. 2d 142 (1970). The parties do not dispute that, on the day in question, Kata was acting under color of state law. The only question is whether Kata violated Cook's rights under the Fourth Amendment.[2]

---

[2] Because Cook was a free person at the time, and the use of force occurred in the course of an arrest or other seizure, plaintiff's excessive force claim arises under the Fourth Amendment and its reasonableness standard, not the Fourteenth Amendment. *Lanman v. Hinson*, 529 F.3d 673, 680 (6th Cir. 2008).

**C. Qualified Immunity**

Kata argues that he is entitled to summary judgment on merits of plaintiff's claims and on the basis of qualified immunity. Qualified immunity is not a mere defense to liability, but shields a government official from suit if the official's conduct in performing a discretionary function does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Pearson v. Callahan,* 555 U.S. 223, 231, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009) (citation omitted). A government official is entitled to qualified immunity even if that official makes a mistake of fact, law, or mixed question of law and fact—qualified immunity provides "ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *Chappell v. City of Cleveland*, 585 F.3d 901, 907 (6th Cir. 2009) (internal quotation marks omitted) (citing *Pearson*, 129 S. Ct. at 815 and *Hunter v. Bryant*, 502 U.S. 224, 229, 112 S. Ct. 534, 116 L. Ed. 2d 589 (1991) (further citation omitted)).

Plaintiff bears the burden of establishing that the defendant is not entitled to qualified immunity, and must do so by showing that, when viewing the evidence in the light most favorable to the plaintiff, (1) the defendant violated a constitutional right, and (2) the right was clearly established in light of the specific context of the case. *Marsilio v. Vigluicci*, 924 F. Supp. 2d 837, 855 (N.D. Ohio 2013) (citing *Saucier v. Katz,* 533 U.S. 194, 201, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001)) (other citations omitted). "For a right to be clearly established, the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.*

(quoting *Feathers v. Aey,* 319 F.3d 843, 848 (6th Cir.2003)). The Court has the discretion to consider the two prongs of *Saucier's* qualified immunity analysis in whatever order is appropriate in light of the circumstances of a particular case. *Scozzari v. Miedzianowski*, 597 F. App'x 845, 847-48 (6th Cir. 2015) (citing *Pearson*, 555 U.S. at 236).

**D. Excessive Force Claim**

The "right to be free from excessive force is a clearly established Fourth Amendment right." *Neague v. Cynkar*, 258 F.3d 504, 507 (6th Cir. 2001) (citing *Walton v. City of Southfield*, 995 F.2d 1331, 1342 (6th Cir. 1993)). Therefore, to decide whether Kata is entitled to summary judgment on qualified immunity with respect to Cook's excessive force claim, the Court must first determine whether there is a genuine dispute of material fact as to whether Kata's use of force was excessive in violation of the Fourth Amendment, that is, whether Kata's tasing of Cook was objectively reasonable in light of the facts and circumstances confronting Kata at the time. *Goodwin v. City of Painesville*, 781 F.3d 314, 321 (6th Cir. 2015) (quoting *Graham v. Connor*, 490 U.S. 386, 397, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989) ("As in other Fourth Amendment contexts . . . the 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them[.]")). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight[,] . . . and must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are

tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97 (citation omitted).

Three factors must be considered in evaluating an excessive force claim under the Fourth Amendment: (1) the severity of the crime at issue; (2) whether the suspect posed an immediate threat to the safety of the officer or others; and (3) whether the suspect was actively resisting or attempting to avoid arrest by flight. *Id*. at 396. The "final step in the *Graham* analysis" requires the Court to consider whether the totality of the circumstances justifies the force used.  *Goodwin*, 781 F.3d at 324 (quoting *Graham,* 490 U.S. at 396).

### 1. Preclusive effect of aggravated menacing conviction

Before undertaking the *Graham* analysis, the Court must first consider the effect, if any, of Cook's conviction for aggravated menacing on the excessive force analysis. "As a general rule, a federal civil action brought under § 1983 is not a venue for re-litigating issues that were decided in a prior state criminal case." *McKinley v. City of Mansfield*, 404 F.3d 418, 428 (6th Cir. 2005) (citing *Allen v. McCurry*, 449 U.S. 90, 103–05, 101 S. Ct. 411, 66 L. Ed. 2d 308 (1980) (principles of collateral estoppel and res judicata apply in § 1983 actions)). "A state court judgment must be given the same preclusive effect in federal court that it would be given in the courts of the rendering state." *Walker v. R. Schaeffer*, 854 F. 2d 138, 142 (6th Cir. 1988) (citing *Migra v. Warren City Sch. Dist. Bd. of Educ.,* 465 U.S. 75, 85, 104 S. Ct. 892, 79 L. Ed. 2d 56 (1984)). In order for a state court judgment to have a preclusive effect in a § 1983 action, the litigant against whom preclusion is sought must have had a "full and fair opportunity" to litigate

the claim or issue decided by the state court. *Allen*, 449 U.S. at 95 (citation omitted); *Walke*r, 854 F.2d at 142.

### a. Preclusion under Ohio law

Because Cook's criminal trial took place in Ohio, the Court applies Ohio issue preclusion law to determine whether Cook may relitigate in this case any facts and issues decided in Cook's aggravated menacing case. *McKinley,* 404 F.3d at 428 (citing *Migra,* 465 U.S. at 81 (federal courts apply the collateral estoppel law of the state which issued the prior judgment)) (other citations omitted).

"In Ohio, 'issue preclusion precludes relitigation of an issue that has been actually and necessarily litigated and determined in a prior action.'" *McKinley*, 404 F.3d at 428-29 (6th Cir. 2005) (quoting *MetroHealth Med. Ctr. v. Hoffmann–Laroche, Inc.,* 685 N.E.2d 529, 533 (Ohio 1997)) (internal quotation marks and citations omitted); *see also State v. Williams*, 667 N.E.2d 932, 935 (Ohio 1996) ("The doctrine of collateral estoppel, or, more correctly, issue preclusion, precludes further action on an identical issue that has been actually litigated and determined by a valid and final judgment as part of a prior action among the same parties or those in privity with those parties.") (citations omitted); *Thompson v. Wing*, 637 N.E.2d 917, 923 (Ohio 1994) ("Collateral estoppel applies when the fact or issue (1) was actually and directly litigated in the prior action, (2) was passed upon and determined by a court of competent jurisdiction, and (3) when the party against whom collateral estoppel is asserted was a party in privity with a party to the prior action.") (citation omitted).

"[T]his understanding of collateral estoppel is consonant with the Supreme Court's view of the doctrine as it applies in the § 1983 arena." *McKinley,* 404 F.3d at 428 n.9 (citing *Allen*, 449 U.S. at 94 ("Under collateral estoppel, once a court has decided an issue or fact necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case.")).

### b. Cook's aggravated menacing conviction

Plaintiff was charged with aggravated menacing (Ohio Rev. Code § 2903.21) in connection with the same events on June 13, 2013, that form the basis of plaintiff's § 1983 excessive force claim. (Doc. No. 40 at 620-24 "Incident Report"].) The incident report states that Kata was obtaining VINs at Cook's residence when Cook "got aggravated" and told Kata to get off his property if Kata did not have a search warrant. (Incident Report at 624.).

> Mr. Cook then stated that he had a 45 in the shed and he was going to shoot me. . . . Mr. Cook then turned and started walking in the direction of the shed. I told Mr. Cook to stop he turned back to me and through [sic] coffee on me. He then turned away and started walking away. I told him to stop or I would Taze him. He did not stop and was told a second with my Tazer drawn. Mr. Cook did not comply and I deployed my Tazer.

(*Id*.).

The aggravated menacing statute at the time[3] Cook was charged and convicted provides in relevant part that:

> (A) No person shall knowingly cause another to believe that the offender will cause serious physical harm to the person . . . .

---

[3] The statute was amended on September 17, 2014.

(B) Whoever violates this section is guilty of aggravated menacing. . . .

Ohio Rev. Code § 2903.21(A) and (B).

A trial was conducted in Girard Municipal Court on the aggravated menacing charge against Cook, at which Cook was represented by counsel. Deputy Wix, Kata, Cook, and Cook's brother (Charles Cook) testified. The testimony of Cook and Kata at the criminal trial mirrors their deposition testimony in this case with respect to their different views of the events leading up to Kata's alleged use of excessive force. Kata testified that Cook stated that Cook had a gun in the shed and was going to shoot Kata if he did not leave his property, and that Kata deployed his taser when Cook refused to stop advancing towards the shed as instructed by Kata. (Tr. at 447-52.) Cook testified that he was tased by Kata when Cook told Kata that he had summoned the Ohio State Highway Patrol and was walking away from Kata to meet the patrol. (Tr. at 552-53.).

At the conclusion of the testimony, the judge instructed the jury that the state was required to prove beyond a reasonable doubt "all the essential elements" of aggravated menacing, that is, that "defendant knowingly caused [Kata] to believe that the defendant would cause serious physical harm to [Kata]." (Tr. at 586-87.) The judge also instructed the jury regarding the elements of the lesser included offense of menacing, which required the government to prove beyond a reasonable doubt that Cook knowingly caused Kata to believe that Cook would cause physical harm to Kata. (*Id.*) The jury found Cook guilty of aggravated menacing. (Tr. at 595-96.).

Plaintiff argues on summary judgment that this Court must credit Cook's deposition testimony, which creates a genuine dispute of material fact, with respect to his excessive force claim. But those same disputed facts were fully and fairly litigated before a jury in a court of competent jurisdiction, and Cook was a party to that action. Under Ohio law, plaintiff is precluded from relitigating those facts—and the jury's conclusion that Cook caused Kata to believe that Cook would cause him serious physical harm—and may not use a § 1983 claim as a forum for doing so. *See McKinley,* 404 F.3d at 428-29.[4]

In opposing defendant's summary judgment motion, Cook does not directly address the preclusive effect of his menacing conviction on his excessive force claim. Rather, plaintiff argues that the conviction does not "blatantly contradict" Cook's deposition testimony with objective evidence, and therefore cannot be used to disregard Cook's deposition testimony on summary judgment. (Opp'n at 636.).

With respect to the summary judgment standard under Fed. Rule Civ. P. 56(c), the Supreme Court in *Scott v. Harris* held that "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007) (respondent's version of events utterly discredited by videotape). Cook contends that his aggravated menacing conviction does

---

[4] Further, to the extent that Cook attempts to assert a claim and argue facts that would overturn his conviction for aggravated menacing or render it invalid, such a claim is not cognizable under § 1983. *See Heck v. Humphrey*, 512 U.S. 477, 114 S. Ct. 2364, 129 L. Ed. 2d 383 (1994).

not blatantly contradict his deposition testimony with respect to the excessive force claim because

> . . . [t]o determine how the individual jurors reached the decision to convict Cook requires a subjective analysis. Factors other than the truth or falsity of each and every aspect of Cook's rendition of all of the critical events may well have influenced the jury. Further, the issues that the jury actually considered in convicting Cook may have differed from the issues on which rulings in this civil case depend.
>
> The **Scott** exception is rooted in the fact that the video tape provided a totally objective, totally accurate depiction of the subject car chase. The jury's verdict in Cook's criminal case is neither sufficiently objective nor sufficiently definitive to invoke **Scott**.

(Opp'n at 636 (emphasis in original).).

But Cook's aggravated menacing conviction under Ohio law prevents Cook from relitigating the issue of whether he caused Kata to believe that he would cause Kata serious physical harm. In essence, as defendant suggests, the jury's verdict is entirely contrary to Cook's version of the facts on this point.

**2. Analysis**

The first *Graham* factor in an excessive force analysis is the severity of the crime. Cook contends that he "committed no crime,"[5] but Cook was charged and convicted of aggravated menacing. Given the nature of the crime—knowingly causing Kata to believe that Cook would cause serious physical harm to him—the first *Graham* factor weighs in favor of Kata.

---

[5] Opp'n at 638.

"The most important *Graham* factor is whether a suspect posed an immediate threat to the safety of the officers or others." *Bustamante v. Gonzalez*, No. CV 07–0940–PHX–DGC (JRI), 2010 WL 396361, at *7 (D. Ariz. Jan. 29, 2010) (citing *Miller v. Clark Cnty.*, 340 F.3d 959, 964 (9th Cir. 2003) (other citation omitted)). The jury found beyond a reasonable doubt that Cook caused Kata to believe that Cook would cause him "serious physical harm," and Cook cannot relitigate that issue in the context of his § 1983 action. Cook's aggravated menacing behavior entitled Kata to reasonably assume that Cook posed an immediate threat to his safety. Even if Cook did not actually have a gun, there is no evidence in the record that Kata knew that at the time. *See Miller*, 340 F.3d at 965 (uncertainty as to whether suspect possessed a gun, ignoring deputy's warnings, and darkness entitled deputy to assume that suspect posed an immediate threat to his safety) (citation omitted). The second *Graham* factor weighs heavily in favor of Kata.

The third *Graham* factor considers whether the suspect was actively resisting or attempting to avoid arrest by flight. In this case, the parties agree that Cook was walking away from Kata, but their testimony as to the reason Cook was walking away is in conflict. Cook states that he was walking away from Kata to meet the Ohio State Highway Patrol. Kata states that he believed Cook was walking to the shed to obtain a gun and ignored Kata's commands to stop. Both Cook and Kata testified regarding these events at the criminal trial, but it is unclear whether that specific factual determination was necessary to resolve in order for the jury to reach the conclusion that Cook posed a serious threat of physical harm to Kata.

14

Cook points to *Goodwin* to support his argument that "[a] police office is justified in tasing a suspect only when the suspect is engaged in "active resistance," and Cook's conduct could not be construed as active resistance. (Opp'n at 642.) But the *Graham* analysis does not hinge on a single factor, and the plaintiff's argument does not accurately reflect the analysis of the court in *Goodwin*. In *Goodwin*, the police responded to a noise complaint at an apartment unit where a party was underway, resulting in two tasings of, and injury to, the host of the party, Mr. Nall. The district court denied defendants' motion for summary judgment on qualified immunity and defendants appealed. Applying the *Graham* analysis on appeal, the Sixth Circuit concluded that, the facts viewed in a light most favorable to the plaintiffs showed that: (1) Mr. Nall's crime of disorderly conduct was not serious; (2) "there was little basis to believe Mr. Nall was a threat to the officers or others"; (3) Mr. Nall's "initial resistance" was at most passive refusal to comply with a request to leave his apartment; and (4) it was "objectively apparent" that Mr. Nall's failure to present his hands to be cuffed was due to taser-induced involuntary convulsions. *Goodwin*, 781 F.3d at 325.

Goodwin is inapposite to the instant action and readily distinguished. First, Cook's crime—aggravated menacing—is a more serious offense than disorderly conduct. Next, because of the preclusive effect of Cook's conviction, there is no dispute that Cook caused Kata to believe he faced serious physical harm. Third, even assuming that Cook's walking away from Kata did not constitute resistance, that fact alone is not dispositive of the *Graham* analysis. *See Kijowski v. City of Niles*, 372 F. App'x 595, 600 (6th Cir. 2010) ("Absent some compelling justification . . . such as the threat of immediate harm—the

15

use of a [taser] on a non-resistant person is unreasonable.") (citing *Wysong v. City of Heath*, 260 F. App'x 848, 855 (6th Cir. 2008)). In the face of a threat of immediate harm to officer safety, it is not objectively unreasonable to use a taser on a non-resistant person. *Id.* ("[B]ecause [plaintiff] offered no resistance, [the officer's] use of his Taser cannot be considered reasonable *without some other indication that [plaintiff] posed a threat*.") (emphasis added). The "final step in the Graham analysis" requires that the Court consider whether the totality of the circumstances justifies the force used. *Goodwin*, 781 F.3d at 324. The Court finds that no reasonable jury could conclude, under the totality of the circumstance, that it was objectively unreasonable for Kata to deploy his taser in the face of the threat of serious physical harm posed by Cook.

Accordingly, given the specific facts of this case—and particularly in light of Cook's conviction for aggravated menacing arising from his encounter with Kata—the Court holds as a matter of law that Kata's use of force was objectively reasonable under the *Graham* analysis and did not violate Cook's rights under the Fourth Amendment. Therefore, Kata is entitled to summary judgment on Cook's excessive force claim. Because no constitutional violation occurred, Kata is also entitled to qualified immunity as to Cook's excessive force claim.

## E. Warrantless Search Claim

The Fourth Amendment of the United States Constitution provides that:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

The protections of the Fourth Amendment turn on the occurrence of a search, and a search is defined in terms of a person's "reasonable expectation of privacy." *Widgren v. Maple Grove Township*, 429 F.3d 575, 578 (6th Cir. 2005). A person's reasonable expectation of privacy is analyzed under a two-part test articulated by the Supreme Court in *Katz v. United States*, 389 U.S. 347, 88 S. Ct. 507, 90 L. Ed. 2d 210 (1967). *Id*. First, the Court must determine whether "the individual manifested a subjective expectation of privacy in the object of the challenged search[,]" and second, "is society willing to recognize that expectation as reasonable?" *Id*. (quoting *California v. Ciraolo,* 476 U.S. 207, 211, 106 S. Ct. 1809, 90 L. Ed. 2d 210 (1986)).

There is no dispute that Kata came to Cook's residence on June 13, 2013 without a warrant solely to obtain VINs from "junk" vehicles on Cook's property. Cook alleges that this violated his rights under the Fourth Amendment.

Kata contends that he is entitled to summary judgment based upon the "open fields" exception to the Fourth Amendment's warrant requirements. Cook argues that the open fields exception to the Fourth Amendment does not apply because Cook's residential property is "not massive" and a reasonable person could conclude that Cook had an expectation of privacy as to all of his property. Cook also argues that even if the vehicles were located in an "open field" for purposes of Fourth Amendment analysis, the subject of Kata's "search" was the VINs, which Kata testified were not in plain view (Kata Dep. at 280), and a reasonable person could conclude that Cook had a legitimate privacy interest in the vehicles. (Opp'n at 640.).

**1. Open fields doctrine and curtilage**

An exception to the protection of the Fourth Amendment's requirement for a warrant is the open fields doctrine, which "was founded upon the explicit language of the Fourth Amendment. That amendment indicates with some precision that places and things encompassed by its protections. . . . '[T]he special protection accorded by the Fourth Amendment to the people in their persons, houses, papers, and effects, is not extended to open fields. The distinction between the latter and the house is as old as the common law.'" *Oliver v. U.S.*, 466 U.S. 170, 176, 104 S. Ct. 1735, 80 L. Ed. 2d 214 (1984) (quoting *Hester v. United States*, 265 U.S. 57, 59, 44 S. Ct. 445, 68 L. Ed. 898 (1924) (some internal quotation marks omitted)).

No reasonable expectation of privacy exists in "open fields," which include unoccupied or undeveloped areas outside the curtilage. The curtilage of a home is the area that "harbors the intimate activity associated with the sanctity of a man's home and the privacies of life." *United States v. Dunn*, 480 U.S. 294, 300, 107 S. Ct. 1134, 1139, 94 L. Ed. 2d 326 (1987) (internal quotation marks and citations omitted). In determining whether an area is within a home's curtilage, there are four factors to consider: (1) the proximity of the area claimed to be curtilage to the home; (2) whether the area is included within an enclosure surrounding the home; (2) the nature of the uses to which the area is put; and (4) the steps taken by the resident to protect the area from observation by people passing by. *Dunn*, 480 U.S. at 301.

In support of his position on summary judgment that the open fields exception to the Fourth Amendment applies, Kata advances his undisputed testimony that when arriving on the scene, Kata parked his vehicle on the road and the "[v]ehicles are all there right off the side of the road[.]" (Kata Dep. at 272.) Kata had to walk about "four feet" onto Cook's property to reach the vehicles[6] and there were approximately 20-25 vehicles. (Kata Dep. at 275-76.).

In response to defendant's evidence advanced in support of the open fields exception to the Fourth Amendment and summary judgment—that the area of Cook's property upon which nearly two dozen "junk" vehicles were parked was directly proximate to the road—Cook's sole argument that the area of his property upon which the vehicles were located should be considered curtilage is that the property was "not massive" and in a residential area, and a reasonable person could conclude that Cook had a reasonable expectation of privacy as to all of the subject property. (Opp'n at 640.) But in his conclusory argument, Cook has advanced nothing to create a dispute of fact as to whether the area where the "junk" vehicles were parked was in proximity to the house, or whether it was associated with the intimacies and sanctities of private life, or used for any domestic purpose. *Widgren*, 429 F.3d at 582 (mowed area used for activities and privacies of domestic life as manifested by presence of a picnic table and fire pit). Nothing in the record indicates that the area at issue, which was about four feet from the road, was included within an enclosure surrounding Cook's home or protected in any way from public view.

---

[6] Trespass is not determinative of a Fourth Amendment search. *Widgren*, 429 F.3d at 583.

19

Curtilage issues are decided on the "unique facts" of each case. *U.S. v. Anderson-Bagshaw*, 509 F. App'x 396, 403 (6th Cir. 2012) (citing *Daughenbaugh v. City of Tiffin*, 150 F.3d 594, 598 (6th Cir. 1998)). Applying the *Dunn* factors to the record before it, the Court finds that no reasonable person could conclude that the area of Cook's property where the junk vehicles were parked was "so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection[]" so as to constitute curtilage. Accordingly, the location of the junk vehicles falls within the open fields exception to the Fourth Amendment. *Dunn*, 480 U.S. at 301. "[A]n individual has no reasonable expectation of privacy in an 'open field,' the area outside a home's curtilage." *Anderson-Bagshaw*, 509 F. App'x at 403 (citing *Oliver*, 466 U.S. at 179).

Even if the "junk" vehicle area was within the curtilage, Kata's presence—solely to obtain the VINs from the vehicles—was not so intrusive as to constitute a search under the Fourth Amendment. There is no dispute that Kata did not approach, touch, or look into Cook's home, park in his driveway, or otherwise stray beyond the area reasonably necessary to obtain the VINs. *See Widgren*, 429 F.3d at 581-86 (The Fourth Amendment does not categorically bar all government encroachment on curtilage, and purpose, nature, and extent of intrusion all must be considered.).

No reasonable person could conclude that Cook had a reasonable expectation of privacy in the "junk" vehicle area, a mere four feet from the road, and Kata's entry onto Cook's property at that location did not constitute a violation of the Fourth Amendment. Accordingly, the Court concludes as a matter of law that Kata is

20

entitled to summary judgment on Cook's warrantless search claim. Because no constitutional violation occurred, Kata is also entitled to qualified immunity.

### 2. No reasonable expectation of privacy in VINs

In this case, it is undisputed that Kata's "search" was solely directed at obtaining the VINs from Kata's vehicles. The Supreme Court has determined that there is no reasonable expectation of privacy in a VIN. In *New York v. Class*, 475 U.S. 106, 106 S. Ct. 960, 89 L. Ed. 2d 81 (1986), two New York City police officers stopped a car for a traffic violation. One of the officers opened the car door to look for the VIN on the doorjamb, but it was not visible. The officer then reached into the vehicle to move papers on the dashboard obscuring the area where the VIN would be located. In doing so, the officer observed the handle of a gun protruding from under the driver's seat and seized the gun. *Class*, 475 U.S. at 106. The defendant moved to suppress the gun as evidence, but the trial court denied the motion and defendant was convicted of criminal possession of a weapon, and the Appellate Division of the New York Supreme Court upheld the conviction. The New York Court of Appeals reversed, holding that there was no justification for the search, and the police officer's intrusion into the passenger compartment of the vehicle to obtain the VIN was prohibited, thus the gun must be excluded from evidence.

In reversing the New York Court of Appeals, the Supreme Court began by discussing the important role the VIN plays in the government's regulation of the automobile, and that to "facilitate the VIN's usefulness[,] federal law requires that the VIN be placed in plain view from outside the vehicle." *Class*, 475 U.S. at 111. In

addition, the Supreme Court recognized that an individual has a lesser expectation of privacy in their automobile than in their home because it serves as transportation and "seldom serves as one's residence or as the repository of personal effects[,]" and unlike a home, is subject to "pervasive and continuing governmental regulation and controls[.]" *Id.* at 112-13 (citation omitted). "A motorist must surely expect that such regulation will on occasion require the State to determine the VIN of his or her vehicle, and the individual's reasonable expectation of privacy in the VIN is thereby diminished. This is especially true of a driver who has committed a traffic violation." *Id*. at 113 (citation omitted). Accordingly, the Supreme Court held that "there was no reasonable expectation of privacy in the VIN. We think it makes no difference that the papers in the respondent's car obscured the VIN from the plain view of the officer. . . . The mere viewing of the formerly obscured VIN was not, therefore, a violation of the Fourth Amendment." *Id*. at 114.  Further, given that the officer's intrusion into the interior of the vehicle was limited to the space where the VIN was located to move the offending papers, the Supreme Court held that the search was "sufficiently unintrusive to be constitutionally permissible in light of the lack of a reasonable expectation of privacy in the VIN and the fact that the officers observed respondent commit two traffic violations[.]" *Id.* at 118-19.

In this case, there is no dispute that Cook had received a notice and summons regarding "junk" vehicles on his property, or that he attended a "pretrial" conference with the prosecutor and Deputy Wix regarding removal of the "junk" vehicles. (Tr. at 512-15.) There is also no dispute that Kata arrived at Cook's property on the day in question solely for the purpose of obtaining the VINs from the "junk" vehicles.

22

(Opp'n at 639-40 ("Everyone agrees that Kata's sole reason for being on Cook's property was to check VINs for several inoperable vehicles located on the property.").) The VINs were not in plain view because of dirt on the windshields, and according to Kata, he

> had to put a little spit on [his] finger and rub on the windshield to see what the VIN number was because it had been there so long. It wasn't like going to a car lot and walk up to the window look in and get the VIN number. There was a little effort to get the VIN number through the dirt.

(Kata Dep. at 283-84.)

Kata testified that he did not enter any of the vehicles to retrieve the VINs, but opened the vehicle door to verify the VIN. (Kata Dep. at 279.) With respect to one of the vehicles, Cook testified that Kata did enter the vehicle: Kata was "laying across the front seat of my station wagon. I watched him rifle through the station wagon for a few minutes and I asked him, "What are you doing?" (Cook Dep. at 343.) But even if Kata was inside the vehicle, Cook does not contend that Kata was in the vehicle for any purpose other than to obtain the VIN.

Cook had no reasonable expectation of privacy in the VINs of his vehicles, and the fact that the VINs may have been obscured, or that Kata may have had to enter a vehicle to obtain the VIN, is insufficient to create a privacy interest. *Class*, 475 U.S. at 112-14. Cook was noticed and summoned for violating Ohio Rev. Code § 4513.65. (Tr. at 612-16). Kata's "search" of the vehicles was limited to obtaining the VINs in connection with the violation and summons. Under these undisputed facts, the Court concludes that Cook had no reasonable expectation of privacy in the VINs of his "junk" vehicles, and Kata's actions in obtaining the VINs from Cook's vehicles without a warrant were constitutionally permissible and did not violate the Fourth Amendment.

*Class*, 476 U.S. at 119; *Zerod v. City of Bay City*, No. 03-10098-BC, 2006 WL 618874, at *12-13 (E.D. Mich. Mar. 9, 2006) (no reasonable expectation of privacy in VIN and Fourth Amendment not violated when officer's purpose and actions were to obtain VINs in connection with nuisance citation).

For these reasons, Kata did not violate the Fourth Amendment by obtaining the VINs without a warrant. Accordingly, for this additional reason, Kata is entitled to summary judgment on Cook's warrantless search claim, and to qualified immunity.

**F. Assault Claim**

Finally, Kata is entitled to summary judgment on Cook's state law assault claim. (Compl. ¶ 7.).

Assault in Ohio is a willful threat or attempt to harm or touch another offensively placing that person in fear of such contact, and battery is an intentional contact that is harmful or offensive. *Stafford v. Columbus Bonding Ctr.*, 896 N.E.2d 191, 200 (Ohio App. Ct. 2008) (citations omitted). But police officers are privileged to commit battery when making a lawful arrest, although the privilege is negated by the officer's use of excessive force. *Alley v. Bettencout*, 730 N.E.2d 1067, 1073 (Ohio App. Ct.1999). In this case, the Court has concluded that Kata did not use excessive force in deploying his taser. Therefore, pursuant to the privilege, Kata is entitled to summary judgment on plaintiff's assault claim. *Cf. Martin v. City of Broadview Heights*, No. 1:08 CV 2165, 2011 WL 3648103, at *14 (N.D. Ohio Aug. 18, 2011) (defendants not entitled to summary judgment on plaintiff's assault and battery claim on the basis of privilege

24

because plaintiff's have presented evidence of excessive force) (citing *Alley*, 730 N.E.2d at 1073).

Further, Kata is immune from suit pursuant to Ohio Rev. Code § 2744.03(A)(6).[7] That section provides in relevant part that:

> (A) In a civil action brought against a political subdivision or an employee of a political subdivision to recover damages for injury, death, or loss to person or property allegedly caused by any act or omission in connection with a governmental or proprietary function, the following defenses or immunities may be asserted to establish nonliability:
>
> * * *
>
> (6) . . . the employee is immune from liability unless one of the following applies:
>
> > (a) The employee's acts or omissions were manifestly outside the scope of the employee's employment or official responsibilities;
> >
> > (b) The employee's acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner;
> >
> > (c) Liability is expressly imposed upon the employee by a section of the Revised Code.

In opposing immunity for Kata under this section, Cook does not contend that Kata was acting manifestly outside the scope of his employment or that any liability is expressly imposed upon Cook by another section of the Ohio Revised Code. Rather, Cook contends that Kata is not entitled to such immunity because, crediting Cook's version of events, Kata's use of a taser on an unarmed man constituted malicious conduct and a wanton infliction of pain. (Opp'n at 643 ("[T]asing an unarmed man who is not

---

[7] The Political Subdivision Tort Liability Act is applicable to Kata as a deputy of the Trumbull County Sheriff's department. *See Young v. Summit Cnty.*, 588 N.E.2d 169 (Ohio App. Ct. 1990).

threatening an officer amounts to **wanton** infliction of pain." (emphasis in original)).) But Cook was convicted of causing Kata to believe that Kata faced serious physical harm, and Court has determined that Kata's use of the taser was objectively reasonable under the circumstances and did not constitute excessive force. Accordingly, Kata is entitled to immunity on Cook's state law assault claim pursuant Ohio Rev. Code § 2744.03(A)(6).

### III. CONCLUSION

For the reasons contained herein, defendant's motion for summary judgment on plaintiff's federal and state law claims is granted. Accordingly, this action is dismissed.

**IT IS SO ORDERED**.

Dated: November 10, 2015

**HONORABLE SARA LIOI**
**UNITED STATES DISTRICT JUDGE**